UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NICHOLAS GLISSON (Estate of) Alma Glisson, Personal Representative of Estate, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| INDIANA DEPARTMENT OF CORRECTION, CORRECTIONAL MEDICAL SERVICES, INC., MALAKA G. HERMINA Dr., MARY COMBS nurse, | ) ) ) ) ) ) | No. 1:12-cv-01418-SEB-MJD |
| Defendants. | ) ) ) | |

## ORDER ON PENDING MOTIONS

This cause is before the Court on the Motions for Summary Judgment filed by

Defendants Correctional Medical Services, Inc., Malaka G. Hermina, M.D., and Mary Combs

[Docket No. 40] and by the Defendant Indiana Department of Correction [Docket No. 57] on

September 10, 2013 and November 27, 2013, respectively. Plaintiff, Alma Glisson, has brought

this action as Personal Representative of the Estate of Nicholas Glisson, pursuant to 42 U.S.C. §

1983, alleging that Defendants were deliberately indifferent to Mr. Glisson's serious medical

needs, which constituted cruel and unusual punishment in violation of his rights under the Eighth

Amendment to the United States Constitution. For the reasons detailed below, we GRANT IN

PART the CMS Defendants' Motion for Summary Judgment as to all federal claims brought

pursuant to § 1983 and REMAND the remaining state law claims to Marion Superior Court.[1]

---

[1] All pending motions to limit or exclude expert testimony filed by Defendants [Docket Nos. 51, 52, 79, 83, and 85] are DENIED AS MOOT because the testimony Defendants seek to exclude does not alter our determination that Plaintiff's federal claims cannot survive summary judgment.

**Factual Background**[2]

**Mr. Glisson's Physical Health Issues Prior to Incarceration**

This action arises out of the death of Mr. Glisson on October 10, 2010, at the age of fifty while he was incarcerated at Plainfield Correctional Facility. Mr. Glisson had several longstanding, chronic medical conditions upon entering into custody at the Indiana Department of Correction on September 3, 2010. His medical difficulties stemmed primarily from a diagnosis of laryngeal cancer in 2003, which required extensive surgery performed on October 17, 2003, by Richard Borrowdale, M.D., to remove his larynx and part of his pharynx. During that surgery, Mr. Glisson also had a tracheoesophageal puncture for voice restoration. Dr. Borrowdale extracted portions of Mr. Glisson's mandible and thirteen teeth and performed bilateral modified neck dissections at that time as well. As a result of the surgery, Mr. Glisson was left with a permanent stoma, or opening in his throat, with placement of a tracheostomy tube. Mr. Glisson was given training on how to care for the stoma and tracheostomy tube, which involved keeping the area clean using saline solution and using a suction machine to clear saliva and mucous secretions from the stoma when necessary.

On October 28, 2003, Dr. Borrowdale performed a follow-up examination of Mr. Glisson, noting that Glisson had been fitted for a voice prosthesis and opining that Glisson would require postoperative radiation treatment to further treat the cancer. After Mr. Glisson's radiation therapy concluded, Dr. Borrowdale examined him on April 1, 2004, with particular attention to a mass that had developed on the left side of his neck. Fortunately, a biopsy established that the mass was merely granulation tissue and not cancerous.

---

[2] Because Plaintiff has indicated that she does not dispute any of the specific factual assertions in Defendants' statements of facts, we have drawn heavily from Defendants' factual recitations, incorporating additional facts alleged by Plaintiff where applicable.

On June 3, 2004, Mr. Glisson returned to Dr. Borrowdale with complaints of dysphagia or difficulty swallowing. Mr. Glisson was also diagnosed with hypothyroidism as a result of his radiation therapy. To treat Mr. Glisson's swallowing difficulty, Dr. Borrowdale performed a direct esophagoscopy and a blind dilation of Glisson's esophagus, and ordered him to return in six weeks for a follow-up examination. Mr. Glisson's swallowing problems persisted, which led Dr. Borrowdale on December 20, 2004 to again attempt a direct esophagoscopy using a rigid scope. Because Mr. Glisson was experiencing swelling and was unable to flex his head, the scope could not be passed through directly, requiring Dr. Borrowdale to dilate the esophagus using dilators.

Mr. Glisson continued to have difficulty swallowing during the months and, indeed, years following his surgery. On June 24, 2005, Dr. Borrowdale performed an esophagoscopy which revealed a mucosal irregularity at the lower portion of the pharynx above Mr. Glisson's voice prosthesis. Dr. Borrowdale obtained a specimen of this irregularity for biopsy, finding it to be non-cancerous. Dr. Borrowdale again treated Mr. Glisson for dysphagia on September 1, 2005, at which point he noted a mucosal superficial lesion which was also biopsied. On January 16, 2005, Dr. Borrowdale used an esophagoscope to dilate Mr. Glisson's esophagus. On that same date, Dr. Borrowdale made note of the fact that Glisson was a chronic alcoholic.

Dr. Borrowdale again examined Mr. Glisson on June 9, 2006, following which he noted that Mr. Glisson had some leukoplakia, or white patches on his tongue, and erythoplakia, or red lesions in his mouth. Dr. Borrowdale further observed that after nearly three years post-surgery, Mr. Glisson still had a nonhealing area around his stoma and experienced continued difficulty swallowing. On June 26, 2006, Dr. Borrowdale dilated Mr. Glisson's esophagus to excise the anterior floor of his mouth lesion.

Mr. Glisson returned to Dr. Borrowdale on January 26, 2007 with facial swelling and dysphagia. Dr. Borrowdale again performed an esophagoscopy and advised Mr. Glisson to return in six months for further follow up examination.

On May 1, 2007, Mr. Glisson presented to Dr. Borrowdale with complaints of contracture of the neck with pain in the occipital area, along with right shoulder and arm pain. Dr. Borrowdale noted that there was no evidence of disease or cancer, but he was concerned that Mr. Glisson might have some cervical spine disease. Thus, he referred him to neurologist Katherine T. Kobza, M.D., who saw Mr. Glisson on July 6, 2007. Dr. Kobza noted that he had developed progressive problems with neck pain over the previous several years. His neck slumped forward and he had trouble holding his head up, which affected his ability to use his voice prosthesis. Dr. Kobza opined that Mr. Glisson's case was very complicated due to his extensive surgery and post-surgical radiation.

Mr. Glisson returned to see Dr. Kobza on July 25, 2007, after having a CT scan of the cervical spine, which showed a mildly compressed T1 vertebral body and changes throughout the neck region. A nerve study also showed right C7 radicular changes with left C6 and bilateral carpal tunnel. Dr. Kobza's impressions were probable cervical radiculopathy and significant scar tissue. She told Mr. Glisson that there would be limitations on how much capacity could be regained and suggested physical therapy for strengthening and stretching. Dr. Kobza instructed Mr. Glisson to return to see her in four to six weeks.

However, Mr. Glisson did not return to see Dr. Kobza until February 15, 2008, more than six months later. At that time, he continued to have pain and difficulty with his neck. He was wearing a neck brace some of the time during the day to help him hold his head up, although he still had considerable difficulty doing so, especially toward the end of the day. Dr. Kobza noted

that Mr. Glisson had tried an injection and physical therapy without definite improvement and that she had little other treatment protocols to suggest or provide.

On March 25, 2008, Derron K. Wilson, M.D. of the Indianapolis Neurosurgical Group examined Mr. Glisson. Mr. Glisson told Dr. Wilson that he had noticed over the previous two years that his head was falling forward. Dr. Wilson reviewed a March 12, 2008 cervical MRI which showed mild cervical spondylosis, abnormal signal intensity of uncertain origin, and findings possibly suggestive of metatastic lesions. Dr. Wilson was also concerned about Mr. Glisson's report of a recent ten-pound weight loss. Dr. Wilson prescribed Valium as needed for muscle spasms and referred Mr. Glisson to Alexander Yeh, M.D., a radiation oncologist who had managed Mr. Glisson's chemotherapy.

Dr. Yeh examined Mr. Glisson on March 31, 2008, and requested another MRI. Mr. Glisson was subsequently hospitalized at St. Vincent Hospital in Indianapolis from May 28, 2008 to June 4. 2008. Mr. Glisson's discharge summary was completed by Salvatore Grimaldi, M.D., who noted Glisson's history of cancer with surgery, and recent radiologic films and MRI which revealed a cervical spine abnormality. Mr. Glisson continued to suffer from progressive dysphagia with weight loss, and flexion of the neck so severe that it made it difficult for him to clean his tracheal stoma and use his voice prosthesis. During his hospitalization, Mr. Glisson had a gastrojejunostomy tube, also referred to as a "G-tube," place in his upper abdomen to permit nutritional support via tube feeding. No cancerous cells were identified during Mr. Glisson's hospitalization. Mr. Glisson was discharged with home health care and nutrition care to be provided at home.

On August 5, 2008, Mr. Glisson was examined by Dr. Gregory Hellwarth of Orthopedic Spine & Surgery, LLC, who noted that Mr. Glisson had severe neck pain with C1-2 anterior

sublaxation, a history of laryngeal carcinoma with extensive irradiation to the anterior neck, chronic nicotine dependency (and still smoking), and malnutrition. Dr. Hellwarth opined that surgery to address Mr. Glisson's neck problems would be a major undertaking and would carry a huge risk of severe complications. He recommended a CT scan to define the process of the upper cervical spine better. Dr. Hellwarth saw Mr. Glisson again on August 21, 2008, after the CT scan and reiterated his belief that corrective surgery for Mr. Glisson's neck was beyond the scope of what could be offered. Dr. Hellwarth referred Mr. Glisson for further consultation by Dr. Rick Sasso.

On May 5, 2009, Mr. Glisson was examined by neurologist Jay Bhatt, M.D. for evaluation of severe anterocollis, or anterior neck flexion. Dr. Bhatt noted that Mr. Glisson continued to have difficulty swallowing. Dr. Bhatt concluded that Mr. Glisson's anterocollis was due to radiation therapy and recommended botulinum toxin injections. He cautioned, however, that if the flexion was due to fibrosis, the injections would not help. Dr. Bhatt further observed that Mr. Glisson's G-tube would be helpful if he continued to have trouble swallowing. On May 20, 2009, Mr. Glisson underwent an initial set of botulinum injections, but Dr. Bhatt continued to be suspicious that Glisson had contractures and scar tissue in his neck.

On June 17, 2009, Mr. Glisson was examined by Dr. Stacey L. Halum of University Otolaryngology Associates, Inc. In addition to his prior health issues, Mr. Glisson reported that he recently experienced leaking of his voice prosthesis. Dr. Halum observed an area of red, thickened mucosa at the left soft palate which she found concerning, and recommended a biopsy. Dr. Halum also discussed options for addressing and revising Mr. Glisson's stoma. However, because Mr. Glisson had fungal colonization on his voice prosthesis at that time, Dr. Halum recommended a course of antibiotics before changing the prosthesis or revising the stoma.

Mr. Glisson was admitted to Clarian Health on July 20, 2009, for surgical release of neck contractures, esophageal dilation, revision of his tracheoesophageal puncture, an esophagoscopy, a laryngoscopy and biopsy of the left soft palate lesion, and placement of a new voice prosthesis. Mr. Glisson received physical and occupational therapy during his hospitalization and was fitted with a modified cervical collar designed to hold his neck in a more natural and less-flexed position. Mr. Glisson was advised to wear the cervical collar as often as possible, preferably at all times while awake. He was discharged on July 24, 2009.

On August 6, 2009, Mr. Glisson saw Dr. Hallum for a follow-up examination. She noted that his speech was very good and that he was holding his head much higher. In response to Mr. Glisson's desire to adjust his neck brace, he was scheduled to meet with a physical therapist, who would assist in modifying the brace. On September 3, 2009, Mr. Glisson returned to Dr. Hallum at which point she placed a new voice prosthesis that allowed him to drink water with no evidence of leaking.

On September 23, 2009, Mr. Glisson was examined by Dr. Borrowdale who reviewed the results from Glisson's June 17, 2009 biopsy of the left soft palate lesion. The results of the biopsy showed squamous cell carcinoma requiring surgical recision, which Dr. Borrowdale performed on October 8, 2009. Dr. Borrowdale again examined Mr. Glisson on December 18, 2009, and noted that he continued to be in very poor health.

At a March 23, 2010 examination of Mr. Glisson, Dr. Borrowdale noted a lesion on his left lateral tongue which was suspicious for carcinoma. Dr. Borrowdale obtained a specimen for biopsy and ordered a PET scan. The lesion was cancerous and Dr. Borrowdale excised it on April 28, 2010. In a follow-up visit on June 24, 2010, Dr. Yeh noted that Mr. Glisson was improving but that he continued to suffer from severe fibrosis causing neck retraction and pain.

**Mr. Glisson's Cognitive and Mental Health Issues Prior to Incarceration**

On October 1, 2009, Mr. Glisson complained to Dr. Fisher of poor memory. On October 2, 2009, Mr. Glisson's attorney contacted Dr. Borrowdale's office and requested that Glisson's memory issues be evaluated by a neurologist to determine what effect his medication regime had on his brain.

On January 14, 2010, Dr. Kozba, a neurologist, examined Mr. Glisson. Dr. Kozba had previously seen Mr. Glisson in November 2009 and thereafter was given an MRI and neuropsychological testing. At the January 14 appointment, Dr. Kozba noted that Mr. Glisson was struggling with memory and depression. A December 11, 2009 MRI of his brain was normal, but neuropsychological testing performed on December 14, 2009 showed a mild neurocognitive decline with difficulties related to attention span, processing speeds, verbal fluency, and memory, along with signs of significant depression. Dr. Kozba observed:

> Mr. Glisson's neuropsychological evaluation did demonstrate some mild cognitive impairment. This is likely multifactorial both from his ongoing illness, alcohol consumption but the overwhelming finding was that of significant depression as well. At this point, this has not been addressed or treated and I think he definitely deserves treatment. I worry about his psychological status in terms of plans to testify in court in the next several weeks and I think that maybe this needs to be carefully thought out whether he is able to handle this. I will institute some therapy with Celexa today to see if we can get some symptoms under control but this will not take effect for 4 to 6 weeks.

Defs.' Exh. 37.

**Mr. Glisson's Alcohol Issues**

At some point prior to Mr. Glisson's throat cancer diagnosis in 2003, he participated in a twelve-step program through Alcoholics Anonymous ("AA") to address his alcoholism. However, on August 12, 2006, Mr. Glisson was examined by his primary care physician, William Fisher, M.D., who noted that Mr. Glisson's main problem was that he continued to be a

heavy consumer of alcohol. Dr. Fisher advised Mr. Glisson to return to an AA program and to quit both drinking and smoking. Dr. Fisher also noted concern regarding Mr. Glisson's compliance with the medication Synthroid, which he took to address his chemotherapy-induced hypothyroidism. When Mr. Glisson returned on August 15, 2008 for refills of Oxycodone and Oxycontin, Dr. Fisher noted that Mr. Glisson continued to use alcohol. On January 19, 2009, Mr. Glisson again visited Dr. Fisher for treatment of blisters on his heels. At that appointment, Dr. Fisher noted that Mr. Glisson smelled of alcohol.

**Mr. Glisson's Ability to Care for Himself**

Despite his significant health issues, from 2003 to 2010, Mr. Glisson was able to take care of his stoma and suctioning independently, without assistance. Plaintiff Alma Glisson, Mr. Glisson's mother, testified by deposition that although both she and Mr. Glisson's sister were present when he was taught how to perform the cleaning and suctioning of his tracheostomy/stoma vent shortly after his 2003 surgery, he would not allow them to help him and insisted on doing it himself.

Plaintiff testified that she did help Mr. Glisson with certain other tasks at times, such as assisting him with his feeding tube and keeping it clean as well as helping to make sure he took the right medication at the right time. However, she also testified that Mr. Glisson used the feeding tube only occasionally and that he generally took food or nutritional supplements like Ensure or Boost through his mouth. According to Plaintiff, Mr. Glisson ate well and took Ensure or Boost six times per day as prescribed, unless he ate a sufficient amount of other food so that he did not require as many supplements.

Mr. Glisson lived alone, except for brief periods of time when he stayed with his family to help care for his sick grandmother and dying brother. Plaintiff testified that she was never

aware of any problems with his hygiene. To the contrary, he kept clean, took regular baths, and washed his own laundry. Plaintiff testified that, during the week or so before he was incarcerated in August 2010, Mr. Glisson came to her house to mow the lawn, clean her French doors, do some cooking, and help care for his brother. According to Plaintiff, although Mr. Glisson had health issues, he was able to live with them. She testified that: "[H]e had no voicebox, no thyroid, neck breather, and that was the condition he was in. But he got along very well with it, very well for what happened to him." Pl.'s Exh. C at 122. Plaintiff did not believe that Mr. Glisson's condition was deteriorating before his incarceration.

**Physicians Express Concern for Mr. Glisson's Condition Prior to Incarceration**

On April 30, 2010, Dr. Borrowdale wrote a letter expressing concern regarding incarcerating Mr. Glisson, stating:

> Nick Glisson is a 50-year-old male who has been a cancer patient of mine for at least the last 15 years. He is severely disabled from his cancer and from alcohol. He is severely alcoholic. He is unable to speak because of his laryngectomy and has problems with dysphagia. He is also very kyphotic and has problems ambulating. The patient has also had a cancer of the soft palate and just recently, of his tongue. This patient is severely disabled, and I do not feel that he would survive if he was incarcerated.

Defs.' Exh 38.

On July 1, 2010, Mr. Glisson's voice prosthesis was changed after it had fallen out. On August 26, 2010, Dr. Fisher wrote a letter stating:

> Nicholas [Glisson] is an unfortunate gentleman with many health problems needing daily observation for monitoring of these problems. He has had surgery for throat cancer and has a permanent tracheostomy. He has severe DJD of his cervical spine with deformity of his neck/unable to lift his head, difficulty swallowing and talking. He is unable to be away from his home by himself. He would not do well if incarcerated.

Defs.' Exh. 40.

**Mr. Glisson's Last Examination by Dr. Fisher Prior to Incarceration**

Dr. Fisher last saw Mr. Glisson on August 19, 2010. At that examination, Dr. Fisher observed that Mr. Glisson was stable. In particular, he was fully able to take care of himself, clean his tracheostomy, and take food through a feeding tube when necessary. Dr. Fisher also observed that, while Mr. Glisson still had trouble swallowing and talking, he had managed to care for himself throughout the six years following his surgery. According to Dr. Fisher, he never had end-of-life discussions with Mr. Glisson and he had not considered any such medical planning for Glisson.

**Mr. Glisson's Incarceration at Wayne County Jail**

On August 31, 2010, Mr. Glisson was sentenced to a period of incarceration and taken to the Wayne County Jail. His attorney, David Jordan, wrote a letter to the Wayne County Sheriff stating that Mr. Glisson had very serious medical conditions, including throat cancer, and that he had a feeding tube, voice box, and other issues that required daily attention. A Booking Screening Form signed by Mr. Gleason on August 31, 2010, noted that Mr. Glisson had a "trache" and that he looked unsteady and was unable to raise his head.

On that same day, Michelle Cruse, a nurse at the Wayne County Jail, noted that she had spoken with Plaintiff Alma Glisson and that Ms. Glisson planned to bring supplies to the jail that Mr. Glisson needed to treat his medical conditions. There is no evidence that Nurse Cruse performed an assessment of Mr. Glisson on August 31, but she did note on September 1, 2010, that she had spoken to Mr. Glisson and that he had not told her the previous day that he had a G-tube. There is no indication that Mr. Glisson received any other medical or nursing examination at the Wayne County Jail.

According to Plaintiff, she and Mr. Glisson brought a number of instruments that Glisson used to care for himself and his tracheostomy to the Wayne County Jail when he was taken there

on August 31, 2010. The medical equipment they brought included the machine Mr. Glisson used to suction his tracheostomy, a mirror and light he used to help him clean his tracheostomy, and his neck brace. According to Plaintiff, Mr. Glisson was prescribed a neck brace to help him hold his head up because he had developed problems doing so after his surgeries. By wearing the neck brace, Mr. Glisson could more easily hold his head up, which improved his breathing and speech, and reduced the pain in his neck.

**Mr. Glisson's Transfer to the Indiana Department of Correction and Initial Evaluation**

On September 3, 2010, Mr. Glisson was transferred from the Wayne County Jail to the Indiana Department of Correction's ("IDOC") Reception Diagnostic Center ("RDC"). His transfer documentation included a summary of County Jail Medical Records and attached documentation prepared by Donna Roberts, RN, of the Wayne County Jail. The summary noted that Mr. Glisson had a history of throat cancer, hypothyroidism, throat surgery with a tracheostomy and a G-tube. The summary also identified ongoing treatment, including: using suction; G-tube feedings; soft foods; and Boost, a nutritional supplement. A list of medications was attached that included Levothyroxine, Omeprazole, Oxycontin, Rampiril, Effexor, Veramyst, and Flexeril. Documentation attached to the summary indicated that Mr. Glisson used his suction machine as needed to suction his stoma, that he used an antiseptic oral rinse, and that he had swabs for stoma care.

When Mr. Glisson was transported to IDOC's RDC, personnel at the Wayne County Jail gave the transport officers Glisson's equipment to be transported with him. However, there is no record of who at RDC (e.g., whether it was a DOC employee or a CMS employee) received this equipment. Plaintiff contends that this equipment was never provided to Mr. Glisson after he arrived at RDC nor was it returned to Plaintiff after Glisson's death.

On the same day he was transferred to IDOC, Mr. Glisson was assessed by Tim P. Sanford, RN, at Reception Diagnostic Center.  Nurse Sanford noted Mr. Glisson's self-reported medication regimen included Levothyroxine, Effexor, Omeprazole, Flexeril, Oxycontin, and Altace, which is another name for Ramipril.  Nurse Sanford described Mr. Glisson as alert and able to make his needs known using his voice prosthesis and noted that he had a tracheostomy that was suctioned approximately six times per day, and that his G-tube was used only when he had difficulty swallowing.  According to Nurse Sanford's notes, Mr. Glisson would receive Levothyrozine Sodium, Lisinopril, Clonidine HCL, Oxycontin, Prilosec, and Flexeril.

**Mr. Glisson's Health Condition from September 4, 2010 to September 10, 2010**

On September 4, 2010, Mr. Glisson performed his own tracheostomy care and cleaned his stoma.  Pamela E. England, RN, noted that Mr. Glisson was permitted to be fed in his cell, and that he could use a bandana to cover his tracheostomy.

On the evening of September 5, 2010, Mr. Glisson was identified as a suicide risk by IDOC custody staff and transferred from general population to segregation.  Custody staff members reported to Rachel M. Johnson, RN, that Mr. Glisson was angry and throwing candy out of his cell.  Nurse Johnson evaluated Mr. Glisson in his cell, but because of security measures, she was unable to take his blood pressure.  She was able to determine that Mr. Glisson had a pulse of 60 and an oxygen saturation level of 84%, which was quite low.  Mr. Glisson stated that he was angry with the custody officers for not listening to him and that he had not been trying to hurt himself.  Staff members on the day shift had told Nurse Johnson that Mr. Glisson had seemed confused, but when Nurse Johnson evaluated him, he was alert and oriented.  Custody officers relayed to Nurse Johnson that Mr. Glisson had consumed only milk for two days and that he was not eating.  They further advised her that Mr. Glisson could not be brought

to the medical clinic area because he refused to be handcuffed. Nurse Johnson and Carla DeWalt, RN, went to the segregation cell to assess Mr. Glisson further. His oxygen saturation level was at that time fluctuating between 84% and 94% with breathing and position changes. Mr. Glisson told Nurse Johnson that he had not used his suction machine to clear secretions from his tracheostomy that day. He was eventually brought to the medical clinic where he was allowed to use his suction machine, at which point his oxygen saturation improved to 96%. However, according to the nurses' notes, he still appeared confused and was taken back to the segregation area on suicide watch.

The next morning, September 6, 2010, Mr. Glisson was again brought to the medical clinic area to suction his tracheostomy. He was alert and oriented with normal vital signs, including temperature of 98.3 degrees, blood pressure of 122/82, a pulse of 92, a respiratory rate of 20, and an oxygen saturation of 98%. Victoria M. Crawford, RN, instructed custody staff to notify medical staff if Mr. Glisson became confused or disoriented.

Later that day, Tina M. Burger, LPN, was summoned to the segregation area because Mr. Glisson was not responding to questions from the custody staff. Nurse Burger noted that he had been placed in a wheelchair but would not sit up. Mr. Glisson was brought to the medical clinic for further observation. His breath sounds were clear and regular, but his blood pressure was elevated to 159/107. Nurse Burger administered Clonidine to address his elevated blood pressure and continued to monitor his vital signs. Mr. Glisson remained unresponsive until Nurse Crawford performed a corneal touch at which point he awoke completely and became alert and oriented.

Mr. Glisson returned to the medical clinic from segregation again later that evening for suctioning and monitoring of his vital signs. His vital signs were normal except for his oxygen

saturation level, which was 86%. After Mr. Glisson performed his tracheostomy care, his oxygen saturation improved to 94%, but he continued to be somewhat disoriented as to time and place.

On September 7, 2010, Nurse Crawford noted that Mr. Glisson refused to be brought from segregation to the medical clinic. Nurse Crawford visited Mr. Glisson in his cell, observing him to be alert and oriented, but agitated. Mr. Glisson stated that he did not need to be suctioned. His vital signs were normal, with a 99% oxygen saturation level. Mr. Glisson was also assessed that same day by licensed mental health counselor Mary J. Serna. At that assessment, Mr. Glisson reported fair support and adjustment to prison life. He stated that he had a history of blackouts possibly due to "spinal injuries" and also acknowledged drinking alcohol and the use of marijuana.

Mr. Glisson returned to the medical clinic on September 8, 2010, after IDOC officers had taken his bandana from him because he was "making underwear out of it, then applying it to his neck." Nurse Johnson noted that he was extremely aggravated with the custody officers. Mr. Glisson's oxygen saturation was 84% and it remained low even after he was suctioned. Nurse Johnson asked the custody officers to step back and give Mr. Glisson space, and she instructed Glisson to close his eyes and take deep breaths. His oxygen saturation level then rose to 97%. Nurse Johnson also noted that Mr. Glisson had a small skin tear on his left forearm, so she added him to the wound care list.

On September 9, 2010, Mr. Glisson had an initial psychiatric evaluation with Dr. Steven G. Conant. Dr. Conant learned that Mr. Glisson was divorced with two adult children and that he had at that point been on social security disability for about five years. Dr. Conant also noted Mr. Glisson's history of gastroesophageal reflux disease, hypertension, previous throat surgery

and throat reconstruction.  Mr. Glisson acknowledged previous heavy alcohol use, and that he had been diagnosed with depression, for which Effexor seemed to help.  Mr. Glisson stated that his weight was down but that his appetite was "OK."  He agreed to a trial of Prozac in place of Effexor to treat his depression.  Also on September 9, 2010, Mr. Glisson was assessed by nurse practitioner Samuel Kobba, who wrote an order permitting Glisson to be given the Ensure supplemental nutrition drink that he brought with him from the Wayne County Jail.

The next day, on September 10, 2010, Mr. Glisson was assessed by Jill Gallien, MD. Dr. Gallien noted Mr. Glisson's chronic health problems and observed that he appeared thin and had decreased breath sounds, but that his feeding tube and trach site both looked good.  She further noted that he sat with his neck in constant flexion, complained of neck pain, and that he seemed somewhat confused.  Dr. Gallien prescribed Morphine Sulfate, Ensure through December 2010, and a four-day course of Vicodin to treat Mr. Glisson's pain.  On that same day, requests for Mr. Glisson's medical records were sent to Methodist Hospital, Dr. Kobza, CENTA, and Dr. Fisher.  Kelley Kurtz, a Health Services Administrator with IDOC, also contacted Plaintiff by telephone to inquire about Mr. Glisson's medical history as well as behaviors at home, such as whether he spit on the floor when he lived at home.  According to Plaintiff, she told Ms. Kurtz that he did not, and Ms. Kurtz responded that she did not think Mr. Glisson was acting right.

**Mr. Glisson's Health Condition from September 17, 2010 to September 26, 2010**

One week later, on September 17, 2010, Mr. Glisson was transferred from the Reception Diagnostic Center to Plainfield Correctional Facility.  A Prisoner Health History form signed by Mr. Glisson noted that he took with him a suction machine and glasses.  Nikki J. Robinson, LPN, conducted an intake assessment, noting that Mr. Glisson's weight was 119 pounds and that he

had normal vital signs. He was placed in the infirmary upon his arrival. On September 18, 2010, Carol A. Griffin, RN, noted that Mr. Glisson continued to be self-sufficient with his tracheostomy care. Three days later, on September 21, 2010, Dr. James Mozillo ordered that Mr. Glisson be released from the infirmary and housed in general population, with a 90-day bottom bunk pass. Allison M. Ortiz, LPN, assessed Mr. Glisson that same day and noted that he was alert and oriented and that his vital signs were within normal limits. Mr. Glisson was officially discharged from the infirmary at 12:30 p.m. on September 22, 2010.

Mental health professional Catherine Keefer assessed Mr. Glisson the next day (September 23, 2010) at the request of Health Services Administrator Andy Dunnigan. Mr. Dunnigan's concern was based on the fact that Mr. Glisson's cell was unclean and in disarray, and Glisson was sitting on the bottom bunk with his jumpsuit unbuttoned. A piece of plastic tubing and a pill card were on the floor of the cell and Mr. Glisson had scabs and sores on his arms and neck. Mr. Glisson's cell mate reported that Glisson had been picking his scabs, that he was restless and had not slept in twenty-four hours, and that he complained of "children" trying to hurt him. Upon further consultation with Mr. Dunnigan and Director of Nursing Rhonda Kessler, Mr. Glisson was placed on close observation, with fifteen minute intermittent observation, until he could be assessed further the next day by Dr. Conant. Ms. Keefer also noted that Mr. Glisson would be considered for transfer to the psychiatric unit at New Castle Correctional Facility.

On September 24, 2010, Dr. Conant examined Mr. Glisson and opined that Glisson's condition had deteriorated from when he last examined Glisson on September 9, 2010. Mr. Glisson was not adequately caring for himself and his hygiene was poor. Dr. Conant observed water and food on the floor. Although Mr. Glisson was mostly able to follow Dr. Conant's

questions, he appeared disoriented and cognitively unaware. Dr. Conant noted that Mr. Glisson had been started on Morphine on September 10, 2010, and opined that it was possible he was being oversedated. Dr. Contant advised that Mr. Glisson remain in the infirmary as long as he could be adequately managed there.

On the afternoon of September 24, 2010, Mr. Glisson was transferred from the disciplinary unit to the infirmary at Plaintifield Correctional Facility in response to Dr. Conant's recommendation. The level of care provided to offenders in the infirmary at Plainfield Correctional Facility approximates that provided in nursing home care, in that nursing staff is available to offenders at any time and they are regularly monitored by physicians.

Mr. Glisson was assessed in the infirmary by Defendant Mary Combs, RN, on the morning of September 25, 2010. At that point, Mr. Glisson's records identified chronic problems of hypertension, unspecified psychosis, acquired hypothyroidism, depressive disorder, neoplasm of unspecified nature of the digestive system, and unidentified disorders of the skin and subcutaneous tissue. Mr. Glisson was cooperative with the assessment and Nurse Combs noted that Glisson was at that time able to provide care for his tracheostomy and to bring up secretions himself using his suction device, and that he was alert and able to communicate his needs, but that his speech was difficult to understand at times. Nurse Combs further observed that Mr. Glisson's gait was steady, meaning that he was able to stand and walk. Mr. Glisson's temperature was 97.4 degrees, his blood pressure was 100/60, his pulse was 68, his respiration rate was 16, and his oxygen saturation was 90%. All but the oxygen saturation level were within the normal range; oxygen saturation was low.

On September 26, 2010, Nurse Griffin assessed Mr. Glissin in the infirmary. Nurse Griffin noted that: Mr. Glisson was alert and "oriented times three" (a normal finding); he was

ambulating in his room; and he was breathing on room air with unlabored respirations. However, she also noted that he had diminished breathing sounds and transient wheezing which cleared when he coughed. Nurse Griffin observed that Mr. Glisson was able to suction secretions himself, could tolerate food intake and fluids well by mouth, and was able to drink Ensure supplements. Mr. Glisson's temperature was 98 degrees, his blood pressure was 98/58, his pulse was 64, his respiration rate was 16, and his oxygen saturation was 97%. All of these vital signs were within the normal range.

**First Examination by Defendant Malak Hermina, M.D.**

Defendant Malak Hermina, M.D., the lead physician in the infirmary at Plainfield Correctional Facility, first examined Mr. Glisson on the morning of September 27, 2010.[3] Dr. Hermina noted that Mr. Glisson had a history of hypertension, psychiatric disorder, a tracheostomy that had been necessitated by throat cancer, and a history of hypertension. During his examination, Dr. Hermina observed that Mr. Glisson was not communicating properly which Dr. Hermina attributed to his tracheostomy and to dementia. Mr. Glisson also appeared cachectic, or undernourished. Dr. Hermina noted that Mr. Glisson had previous labwork performed on September 9, 2010, which showed anemia and high creatinine. Because Dr. Hermina had not previously examined Mr. Glisson and it was not clear whether there had been further workup following those lab results, he directed that records be obtained from Glisson's previous medical providers so that the medical staff in the infirmary could further assess and understand his medical conditions. Dr. Hermina also noted that the origin and status of Mr. Glisson's mental condition was not clear, but that it was possible that he would be an appropriate

---

[3] In September 2010, Dr. Hermina's typical work hours were Monday to Friday from approximately 6:00 a.m. until early afternoon. He was also available to the infirmary's nursing staff via telephone twenty-four hours a day.

candidate for transfer to the psychiatric unit at New Castle Correctional Facility once his medical conditions and treatment plan were clarified.

To address Mr. Glisson's issues related to poor nourishment, Dr. Hermina ordered Jevity, a nutritional supplement, in addition to the Ensure that Glisson was already taking. Dr. Hermina also ordered a complete red blood count to monitor Mr. Glisson's anemia as well as a white blood count with differential to monitor for infection. Mr. Glisson was also scheduled for a thyroid-stimulating hormone test to monitor his hypothyroidism. To assess whether Mr. Glisson had chronic kidney disease or whether his prior lab results were more suggestive of an acute renal problem, Dr. Hermina ordered fasting labs to be drawn on September 28, 2010, and processed on a "stat" basis, so that results would be available within twenty-four hours of the labs being drawn. Dr. Hermina observed that Mr. Glisson had a skin rash which he noted was suggestive of poor personal cleaning habits, but reported that Glisson's hypertension seemed to be under control. Finally, Dr. Hermina noted that Mr. Glisson had a systolic heart murmur which may have been the result of anemia or hyperdynamic circulation, and ordered that Glisson be monitored further to determine whether he might need an echocardiogram or other testing if the condition persisted.

At 10:35 a.m. on September 27, 2010, requests for Mr. Glisson's prior medical records were faxed to Dr. Fisher, whose office faxed back nine pages of records at 2:47 p.m. that same afternoon. Those records contained notes prepared by Dr. Fisher between July 22, 2010 and September 27, 2010; a procedure note from St. Vincent Hospital from May 29, 2008, reflecting that Dr. Daryl F. Daugherty had performed an esophagogastroduodenoscopy on Mr. Glisson on that date; a letter from Dr. Fisher on July 31, 2009, appealing restrictions on Mr. Glisson's dosage of Oxycontin imposed by "Silverscript PA"; an assessment of Mr. Glisson by Dr.

Gregory Hellwarth on August 21, 2008, for severe neck pain and deformity; a report on Mr.

Glisson from Dr. Katherine Kobza of Josephson Wallack Munshower Neurology on January 14,

2010; and an assessment of Mr. Glisson performed by Dr. Hellwarth on August 5, 2008.

Dr. Hermina testified that he learned the following information regarding Mr. Glisson's

medical history from those records:

- Per Dr. Fisher's notes and letter, Mr. Glisson suffered from kyphosis and back pain which was primarily treated with Oxycontin and Oxycodone, two narcotic pain relief medications.

- Per Dr. Daugherty's May 29, 2008 note, Mr. Glisson suffered from gastroparesis, or partial paralysis of the stomach preventing normal digestion of food, which likely contributed to his poor nourishment.

- Per Dr. Hellwarth's records, Mr. Glisson suffered from neck pain with instability at the first and second levels of the cervical spine, for which he was not a candidate for surgery given his medical history, malnourishment and nicotine dependency. The extent of Mr. Glisson's further workup and treatment for this problem after 2008 was not communicated to me.

- Per Dr. Kobza's report, Mr. Glisson had a history of depression and poor memory, with neuropsychological testing on December 14, 2009, confirming mild neurocognitive decline, contributed to by his ongoing medical conditions, alcohol consumption and depression.

Exh. 68 (Hermina Aff.).

Melissa Pearson, RN, assessed Mr. Glisson in the infirmary on the afternoon of

September 27, 2010. She noted that he was alert and oriented times three and that he was able to

make his needs known. He had a regular heartbeat. His breath sounds were clear and his

respirations were even and nonlabored. Nurse Pearson did note that Mr. Glisson had difficulty

moving, that he had kyphosis of the neck, and that he was emaciated. Mr. Glisson's temperature

was 98.2 degrees, his blood pressure was 100/64, his pulse was 76, his respiratory rate was 16,

and his oxygen saturation was 96%. All of these vital signs were within normal limits. Mr.

Glisson stated that he had pain at a level of two on a scale of one to ten. Nurse Pearson noted that the plan for Mr. Glisson's care would be continued.

Jennifer C. Hoffmeyer, RN, assessed Mr. Glisson in the infirmary in the early morning of September 28, 2010. She noted that Mr. Glisson was disorganized and did not always follow the conversations. White mucous was suctioned from Mr. Glisson's tracheostomy, and he returned to sleep without distress. Later that morning, Nurse Pearson assessed Mr. Glisson, noting that he was alert and oriented times three and able to make his needs known. Nurse Pearson noted a red, raised rash on Mr. Glisson's chest, but he did not complain of itching or pain. She also noted multiple lesions over his upper and lower extremities. Mr. Glisson had a regular heartbeat and clear but somewhat diminished breath sounds. Although his gait was unsteady, he was able to ambulate without assistance. Mr. Glisson's temperature was 98.2 degrees, his blood pressure was 100/78, his pulse was 68, his respiratory rate was 18, and his oxygen saturation was 92%. All of these vital signs were within normal limits.

The next morning, on September 29, 2010, Dr. Hermina again assessed Mr. Glisson. At this time, Dr. Hermina was still waiting on results from the lab tests he had ordered on September 27, 2010. He noted that Mr. Glisson was being considered for transfer to the psychiatric unit at New Castle Correctional Facility and that Glisson had a history of neck surgery due to cancer of the larynx and a history of hypothyroidism. Mr. Glisson related that he had a history of alcohol abuse. Dr. Hermina observed that Mr. Glisson was not communicating properly and continued to appear cachectic. Dr. Hermina noted that Mr. Glisson was difficult to understand and that he engaged in behavior consistent with dementia, such as defecating on the floor and neglecting his personal care. Following his assessment, Dr. Hermina concluded that Mr. Glisson's cachexia would be further addressed by determining whether there had been a

recurrence of cancer and continuing to provide him with Jevity and Ensure nutritional supplements. Dr. Hermina also suggested that, once assessment of Mr. Glisson's other health concerns was completed, a CT scan and orthopedic follow-up would be appropriate to further investigate his neck problems.

Later that day, Nurse Combs assessed Mr. Glisson while Dr. Hermina was making rounds. As Dr. Hermina had indicated in his assessment, Nurse Combs noted that Mr. Glisson was alert but not communicating well. His temperature was 97.4 degrees; blood pressure was 98/60; pulse was 72; respiratory rate was 16; and oxygen saturation was 90%. With the exception of his oxygen saturation level, which was low, Mr. Glisson's remaining vital signs were all normal.

Around 1:30 p.m. that same day, Dr. Hermina retrieved Mr. Glisson's lab results that had been placed in his mailbox at the nurses' station in the infirmary. The results showed that Mr. Glisson's potassium level was over seven, his blood urea nitrogen ("BUN") level was 167, and his creatinine was 6.7, all of which were suggestive of acute renal failure. Dr. Hermina's expectation had been that the lab that performed the tests would immediately inform the prison medical staff of any critical lab results. However, the lab, which is not affiliated with Defendant Correctional Medical Services, Inc., faxed the results to the prison without specific attention being drawn to the critical results and without immediately informing Dr. Hermina or other prison medical staff of the serious findings. The lab report indicates that the results were available by 7:52 a.m. on September 29, 2010, but Dr. Hermina did not receive them until the early afternoon.

Immediately upon receiving Mr. Glisson's lab results, Dr. Hermina ordered an albuterol nebulizer, monitoring of input and output, administration of fluids and insulin along with a

concentrated dextrose solution called D50, and an urgent EKG.  Dr. Hermina also directed that

an ambulance be summoned to transfer Mr. Glisson to the hospital.  Mr. Glisson was transferred

to Wishard Hospital at 2:20 p.m., accompanied by a copy of his infirmary medical records.  Mr.

Glisson remained hospitalized for seven days.

At 12:17 a.m. on October 7, 2010, Mr. Glisson returned to the infirmary at Plainfield

Correctional Facility from Wishard Hospital.  His discharge report contained the following

conditions and treatment information:

- Acute renal failure/acidosis/hyperkalemia on top of chronic kidney disease.  The medical staff at the hospital [was] unable to identify a clear origin for Mr. Glisson's kidney difficulty, and concluded that the likely causes were his psych medications, including Prozac, and volume depletion.  Mr. Glisson received intravenous fluids and bicarbonate and his normal kidney function was restored.

- Acute respiratory insufficiency/pneumonia treated with antibiotics.

- Tracheoesophageal voice prosthesis evaluation.  Mr. Glisson had a voice prosthesis which had apparently been lost two weeks previously.  He did not report loss of the prosthesis to Dr. Hermina or to any other medical staff.  The medical staff at Wishard Hospital noted that Mr. Glisson had been coughing secretions from his tracheostomy.  A new voice prosthesis was placed during his hospitalization.

- Hypothyroidism, for which Mr. Glisson was re-started on thyroxin.  His TSH, which measures his thyroid level, had been assessed via labwork on September 27, 2010, and had been normal.

- Malnutrition, for which the Jevity Dr. Hermina had ordered in the infirmary, in addition to ensure, was continued.

- Squamous cell carcinoma of the left lateral tongue, which was to be followed up on with an ear, nose, and throat specialist as an outpatient.

- Hypertension, for which Mr. Glisson was continued on Lisinopril.

- Chronic pain, for which Mr. Glisson was to continue receiving narcotic pain medication.

- Dementia/psych disorder/depression.  Mr. Glisson did not demonstrate any agitation during his stay at Wishard, but a CT scan of his head confirmed cerebral

volume loss and patch hypodensities within deep subcortical and perventricular white patter consistent with mild dementia and the presence of microvascular disease of the brain. At Wishard, Mr. Glisson was continued on the Prozac he had been receiving in prison.

- A pressure wound on the sacrum which developed during Mr. Glisson's seven-day hospitalization.

Defs.' Exh. 68, ¶ 18; Defs.' Exh. 79.

Upon his return to the prison infirmary, Mr. Glisson was assessed by Nurse Hoffmeyer. She noted that he was alert and oriented, that his respirations were even and unlabored, and that his lung sounds were coarse throughout. Mr. Glisson was able to get into bed without assistance. His temperature was 98.7 degrees; his blood pressure was 140/100; his pulse was 88; his respiratory rate was 16; and his oxygen saturation was 97%. All of these vital signs were within normal limits.

Dr. Hermina examined Mr. Glisson later that morning and documented the plan to comply with all of the orders Mr. Glisson received upon discharge from Wishard Hospital, including follow up with an ear, nose, and throat specialist within four weeks; continuing Jevity and Ensure for nutritional support; continuation of Lisinopril for hypertension, Santyl for the pressure wound he acquired at the hospital; a multivitamin; Valium, Vicodin, and the antibiotic Flagyl; and obtaining a walker to assist him with ambulation. To continue monitoring Mr. Glisson's cachexia, anemia, hypothyroidism, and kidney function, Dr. Hermina ordered follow-up labwork to be obtained on November 1, 2010. In his notes, Dr. Hermina also made mention of the systolic heart murmur he had previously documented, but noted that Mr. Glisson had been assessed at Wishard Hospital with no indication that the murmur was indicative of any further problem, and thus, did not designate any follow-up measures to address the murmur.

Nurse Griffin examined Mr. Glisson in the infirmary later that same day. He complained of pain at a level of five on a scale of one to ten, and she administered pain medication via his gastronomy tube. Nurse Griffin noted that Mr. Glisson had wheezing that cleared when he coughed, and that he had productive sputum from his tracheostomy. Mr. Glisson's suction machine was set up at his bedside for use in clearing his tracheostomy.

The next day, on October 8, 2010, Paula J. Kuria, LPN, assessed Mr. Glisson in the early morning. She noted that Mr. Glisson was in bed but that he had been somewhat restless through the night. Mr. Glisson reported that he was not in pain. Nurse Kuria noted that Mr. Gisson's tracheostomy site was suctioned as needed.

Later that morning, Dr. Hermina again examined Mr. Glisson. Dr. Hermina noted that Mr. Glisson was awake and responded properly, but that he was difficult to understand. Because Mr. Glisson appeared to be having difficulty with oral intake, Dr. Hermina ordered that he be provided nutrition and medication only through his gastronomy tube until he could have an outpatient speech therapy evaluation performed at Wishard Memorial Hospital, which Dr. Hermina ordered occur on an urgent basis. Dr. Hermina did not examine or treat Mr. Glisson again after October 8, 2010.

Later that same day, Allison M. Ortiz, LPN, assessed Mr. Glisson and noted that he was alert and oriented with some periods of confusion, but that he was able to make his needs known. Nurse Ortize further noted that Mr. Glisson seemed somewhat confused and upset, and did not eat any breakfast from his tray. Mr. Glisson's temperature was 98.4 degrees, his blood pressure was 116/76, his pulse was 91, his respiratory rate was 18, and his oxygen saturation was 96%. These vital signs were all within a normal range. On that afternoon, Mr. Glisson participated in a physical therapy session.

The next morning, on October 9, 2010, Nurse Combs assessed Mr. Glisson, observing that he was easily able to bring up thick secretions from his tracheostomy himself using his suction machine. She noted that Mr. Glisson's temperature was 97.4 degrees, his blood pressure was 110/64, his pulse was 81, his respiratory rate was 16, and his oxygen saturation was 93%. These vital signs were all within normal limits.

At the 6:00 a.m. shift change the next morning, on October 10, 2010, Nurse Combs noted that staff coming off shift at that time reported to her that Mr. Glisson had been up in the hallways wandering through the infirmary night shift. When Nurse Combs went to check on Mr. Glisson, she found that he was in another patient's bed grabbing his lower extremities as the other patient woke up. Based on this behavior, Nurse Combs transferred Mr. Glisson to a medical isolation room. At 7:48 a.m., Nurse Combs noted that Mr. Glisson was in bed in the medical isolation room, and that he was restless and moving from one side of the bed to the other. Nurse Combs observed that Mr. Glisson was able to bring up secretions by suctioning his trach stoma and noted: "All equipment will be accessible in hallway outside of room and this patient's grasp for safety issues. Numerous attempts to tell this patient what was done and reason for the different occurrences without evidence of understanding the information being given." Defs.' Exh. 87.

Nurse Combs noted at 8:20 a.m. that she had been alerted by Indiana Department of Correction custody staff that Mr. Glisson appeared not to be moving, and that it was possible that there was blood on the bed. Nurse Combs observed Mr. Glisson sitting upright on the bed with a large ring of brown fluid on the bed under his left shoulder. He was unresponsive; his skin was cold to the touch; he had no bilateral carotid reflexes, and he had bilateral fixed dilated pupils.

Nurse Combs called 911, and by 8:30 a.m. EMS had arrived at Plainfield Correctional Facility. Mr. Glisson was pronounced dead by Dr. Andrew Alaimo at 8:35 a.m.

The Hendricks County Coroner investigated Mr. Glisson's death and noted his history of laryngeal cancer with surgical resection in 2004 resulting in tracheostomy, squamous cell carcinoma of tongue with partial glossectomy, feeding tube placement, respiratory insufficiency, hypertension, chronic kidney disease with episodes of acute renal failure and hyperkalemia, hypothyroidism, and alcohol-induced dementia. The coroner also observed that Mr. Glisson had extreme emaciation and cachexia. Without performing an autopsy, the coroner concluded that Mr. Glisson died of natural causes, specifically, that his death resulted from complications of laryngeal cancer, with contributory chronic renal disease. Mr. Glisson's estate sought a copy of the coroner's file. This request was originally denied but was eventually turned over following an order from this Court on December 20, 2012.

The Hendricks County Coroner subsequently provided Mr. Glisson's medical records to pathologist Steven S. Radentz, M.D. to review. Dr. Radentz concluded that Mr. Glisson's rapid onset altered mental status could have resulted from hypoxia and acute renal failure-type acid-base/electrolyte abnormalities, and the hypoxia could be secondary to a number of potential problems involving his stoma, including aspiration pneumonia, a tracheoesophageal fistula with chemical pneumonitis or collapse/malfunction of the stoma whereby the stomavent became dislodged or partially dislodged. Dr. Radentz observed that the large amount of light brown fluid from Mr. Glisson's stoma suggested a pulmonary process or tracheoesophageal fistula, and that acute renal failure could have been precipitated by volume depletion or dehydration in conjunction with chronic renal failure. Dr. Radentz agreed with the coroner that all of these issues were directly related to Mr. Glisson's throat cancer and laryngectomy.

**Legal Analysis**

## I.     Standard of Care

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if

genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

## II.     Section 1983 Claims

Plaintiff's core federal claims in this lawsuit are that Dr. Hermina and Nurse Combs were deliberately indifferent to Mr. Glisson's serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment and that CMS is liable for having in place a practice or policy that caused Mr. Glisson constitutional injury. We address these claims in turn below.

### A.     Individual Defendants

The Eighth Amendment's prohibition against cruel and unusual punishment protects inmates "against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577

F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

Accordingly, under Seventh Circuit law, a governmental officer may be held individually liable under Section 1983 if he exhibits "deliberate indifference to serious medical needs" of an inmate, such as intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment. *Id.* at 828-29. However, mere negligence in the provision of medical care is not a constitutional violation. *Id.* at 829. "Rather, 'a plaintiff must show both: (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Id.* (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

The objective prong requires that "the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)). Under Seventh Circuit law, "[a]n objectively serious medical condition is one that 'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). To satisfy the subjective component of the test and prove deliberate indifference, a plaintiff must demonstrate that the individual defendants "intentionally disregarded the known risk to inmate health or safety." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006). In other words, "[t]he officials must know of and disregard an excessive risk to inmate health; indeed, they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

When the state actor is a medical professional, the law imposes a more specific threshold for constitutionally actionable misconduct. A doctor or other practitioner's "deliberate indifference may be inferred when 'the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *King v. Kramer*, 680 F.3d 1013, 1018-19 (7th Cir. 2012) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)). Thus, while a prisoner "is not required to show that he was literally ignored" by a medical professional, it is insufficient to allege mistake or medical malpractice; the course of treatment must be "so blatantly inappropriate" that a reasonable fact-finder could infer subjective indifference to the prisoner's needs. *See Greeno*, 414 F.3d at 653-54 (7th Cir. 2005).

Here, there is no dispute that Mr. Glisson suffered from an objectively serious medical condition, and thus satisfies the objective prong of the Eight Amendment standard. Accordingly, the only issue in dispute is the subjective component of the standard, to wit, whether Dr. Hermina or Nurse Combs exhibited deliberate indifference to Mr. Glisson's known medical needs. We address the facts relevant to each defendant in turn below.

### 1. Dr. Hermina

Plaintiff contends that, although Dr. Hermina did not ignore Mr. Glisson's medical needs entirely, his treatment nevertheless fell below the level required to pass constitutional muster. Specifically, Plaintiff faults Dr. Hermina for ignoring acute changes in Mr. Glisson's mental health and failing to search for a physical cause of Glisson's rapid mental decline while incarcerated; ignoring the fact that on several occasions Glisson had below-normal oxygen saturation, which signaled possible health problems, such as pneumonia; and failing to

communicate with medical providers at Wishard, which complicated their ability to properly diagnose and treat Glisson.

However, it is abundantly clear from a review of the record, even when viewed in the light most favorable to Plaintiff as we are required to do at this stage of the litigation, that Dr. Hermina's treatment of Mr. Glisson was neither consciously reckless nor substantially below the standards of his profession.  Accordingly, it did not rise to the level of being a violation of Mr. Glisson's Eighth Amendment rights.   Dr. Hermina first became responsible for Mr. Glisson's care on September 27, 2010, when he initially assessed Mr. Glisson in the jail infirmary, approximately three days after Glisson was transferred there.  Dr. Hermina's assessment included consideration of Mr. Glisson's history of hypertension, psychiatric disorder, throat cancer with tracheosomy and hypothyroidism.  Based on the results of previous labwork dated September 9, 2010, which showed anemia and high creatinine suggestive of a renal problem, Dr. Hermina ordered that follow-up labwork be performed on Mr. Glisson to determine whether the issue was a chronic or acute condition.

At the initial examination, Dr. Hermina also observed that Mr. Glisson suffered from cachexia or malnourishment and ordered that Glisson be given the nutritional supplement Jevity in addition to the supplement he was already receiving to address the problem.  Dr. Hermina noted that the extent of Mr. Glisson's mental condition was still being assessed,[4] but that he might eventually be a candidate for transfer to the psychiatric unit at the New Castle Correctional Facility.  Dr. Hermina opined that Mr. Glisson's hypertension appeared to be under control, but ordered a TSH test to monitor Glisson's hypothyroidism.  Dr. Hermina also observed a systolic heart murmur that he noted would be monitored further to determine whether the condition

---

[4] Dr. Conant, a psychiatrist, examined Mr. Glisson on September 24, 2010, and was the medical professional who advised that Glisson be transferred to the infirmary based on the deterioration Dr. Conant observed in Glisson's mental condition since he had last examined Glisson on September 9, 2010.

persisted and necessitated an echocardiogram or other testing. Following Dr. Hermina's initial

examination of Mr. Glisson, he arranged for a prompt review of Glisson's prior medical records

to develop a further understanding of his medical history, reviewing the records on the afternoon

of the same day on which he conducted Glisson's initial assessment.

When Dr. Hermina next examined Mr. Glisson on the morning of September 29, 2010, he

opined that, once assessment of Glisson's other health concerns was complete, a CT scan and

orthopedic follow-up would be appropriate to further address his chronic neck problems. Upon

receipt of Mr. Glisson's labwork that same afternoon, Dr. Hermina immediately recognized that

Glisson was in renal failure and ordered an albuterol nebulizer, monitoring of input and output,

administration of fluids and insulin along with a concentrated dextrose solution called D50, and

an urgent EKG. Dr. Hermina also directed that an ambulance be called to transfer Mr. Glisson to

the hospital. The ambulance arrived within minutes and Mr. Glisson was immediately

transferred to Wishard Hospital for treatment. When Mr. Glisson returned to the jail infirmary

from the hospital on October 7, 2010, Dr. Hermina implemented every order and intervention

recommended by Glisson's discharge summary. Dr. Hermina again examined Mr. Glisson on

October 8, 2010, and noted that Glisson appeared to be having difficulty swallowing. To address

the issue, Dr. Hermina ordered that Mr. Glisson be provided nutrition and medication only

through his gastronomy tube until he could have an outpatient speech therapy evaluation, which

Dr. Hermina ordered be done on an urgent basis. That was the last time Dr. Hermina examined

Mr. Glisson before his death on October 10, 2010.

Despite the extensive treatment provided by Dr. Hermina during the very limited time

period when he was responsible for Mr. Glisson's care, Plaintiff nevertheless contends that Dr.

Hermina's treatment fell below the standard required by the Eighth Amendment. In support of

her contention that Dr. Hermina was deliberately indifferent to Mr. Glisson's serious medical needs, Plaintiff cites the Eleventh Circuit's decisions in *McElligot v. Foley*, 182 F.3d 1248 (11th Cir. 1999) and *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988). However, not only are these cases not binding on this court, they are clearly factually distinguishable.

In *McElligott*, the first case cited by Plaintiff, the evidence established that despite complaining of abdominal pain, nausea, and vomiting, the plaintiff was not physically examined by the prison physician until thirty days after entering the jail and then did not receive a follow-up examination for seven weeks despite the plaintiff reporting severe pain. The physician then prescribed medications to relieve the plaintiff's pain but did not examine plaintiff again for another six weeks, despite pleas from the plaintiff to be seen. The plaintiff continued to lose weight over the next two months, but the jail physician did not alter the course of treatment. Finally, while the plaintiff was briefly hospitalized, he was discharged to return to the jail based not on a determination that his medical condition had improved, but rather because of cost concerns after the jail nurse calculated the potential expense of ongoing hospitalization. Similarly, in *Carswell*, the other case cited by Plaintiff, the inmate plaintiff made requests for medical attention at the jail for over eleven weeks, all of which were ignored. During those eleven weeks, when he still had not been examined by a physician, the plaintiff lost fifty-three pounds, until his weight dropped to a mere ninety-two pounds. Despite being informed by multiple members of the jail staff as well as the public defender that he needed medical attention, the defendants in *Carswell* "did nothing significant" to ensure that the plaintiff – who turned out to be suffering from undiagnosed diabetes – received the medical care he needed until almost three months after entering the jail.

No such neglect, never mind such a pattern of neglect existed here. As described above, Dr. Hermina examined Mr. Glisson within three days of Glisson's transfer to the infirmary, set out treatment plans for each of the conditions he diagnosed, and then continued to monitor Glisson's condition, examining him on four additional occasions while he was in the infirmary to assist in the management of his care. Dr. Hermina promptly sent Glisson to the hospital when lab results showed he was experiencing acute renal failure, and upon Mr. Glisson's return to the prison infirmary from the hospital, Dr. Hermina implemented all of the hospital staff's instructions. When Dr. Hermina examined Mr. Glisson on October 8, 2010, and he demonstrated difficulty swallowing, rather than ignoring the issue, Dr. Hermina ordered that Glisson be provided nourishment and medication through his gastrostomy tube until an urgent outpatient speech therapy evaluation could be performed. The prompt and frequent attention paid to Mr. Glisson's medical issues by Dr. Hermina clearly differs from the indifference exhibited by the defendants in *McElligot* and *Carswell*. Indeed, Dr. Hermina's treatment of Mr. Glisson was not remotely similar to that of the physician in *Carswell*.

Plaintiff maintains that although Dr. Hermina did not entirely ignore Mr. Glisson, he improperly focused on Glisson's chronic health problems, while ignoring acute changes in Glisson's condition that occurred during his incarceration. To support this contention, Plaintiff first points to the sharp decline in Mr. Glisson's mental status while incarcerated as an example of an acute change ignored by Dr. Hermina. Specifically, Plaintiff argues that Dr. Hermina failed to investigate whether Mr. Glisson's deteriorating mental condition was caused by physical problems. According to Plaintiff's expert, Dr. Diane Sommer, a decline in mental status can be caused by physical issues, such as dehydration, infection, or malnourishment.

It is undisputed that Mr. Glisson demonstrated a marked deterioration in his mental condition while incarcerated, and that deterioration is in fact what initially prompted psychiatrist Dr. Steven Conant to transfer Mr. Glisson to the IDOC infirmary. But the evidence does not support the conclusion that Dr. Hermina ignored this change in Mr. Glisson's mental health or failed to investigate whether a physical problem was causing the mental decline. In fact, Dr. Hermina ordered lab work including a complete blood count ("CBC") when he first examined Mr. Glisson on September 27, 2010, which assists physicians in identifying evidence of infection, one of the possible physical causes of mental decline cited by Plaintiff's expert. Dr. Hermina also took note of Mr. Glisson's malnourishment during that same examination (another possible cause of mental decline cited by Dr. Sommer) and ordered an increase in nutritional supplements to help address the problem. These facts do not support a conclusion that Dr. Hermina failed to address Mr. Glisson's mental decline.

Plaintiff next argues that because Dr. Hermina was aware that Mr. Glisson had abnormal urinalysis results on September 4 and 5, 2010, exhibited evidence of renal failure on September 9, 2010, had abnormal thyroid function on September 13, 2010, and had dropped from 122 pounds on admission to 119 pounds by September 17, 2010, Dr. Hermina should have acted more quickly to address these issues when Glisson first came under his care on September 27, 2010, rather than waiting until he had received the labwork evidencing renal failure on September 29, 2010. Specifically, Plaintiff's expert, Dr. Sommer, testified that Mr. Glisson's condition warranted a "rapid evaluation"; that the labwork to check his renal functioning should have been ordered STAT; and that he should have been given a head CT scan to rule out trauma, stroke, and metastatic disease.

But the undisputed facts establish that, with the exception of the head CT scan,[5] Dr. Hermina addressed the concerns raised by Plaintiff's expert when he assessed Mr. Glisson on September 27, 2010. Dr. Hermina examined Mr. Glisson only three days after he was transferred to the infirmary, and immediately ordered labwork to be performed STAT to test Glisson's renal functioning. At that time, he also made specific orders to address Mr. Glisson's malnutrition and ordered a CBC to assist in identifying infection, both of which are concerns that Dr. Sommer identified as possibly being related to the abnormal urinalyses on September 4 and 5. Additionally, although Mr. Glisson had lost three pounds from the time he was admitted to IDOC to September 17, 2010, he did not lose any more weight by September 27, 2010, when Dr. Hermina examined him. Accordingly, there was no additional weight loss to be addressed. Given these facts, we cannot conclude that Dr. Hermina ignored any acute changes, either mental or physical, in Mr. Glisson's health. Nor is there any indication that Dr. Hermina persisted with ineffective treatment in the face of Mr. Glisson's mental and physical deterioration as Plaintiff claims. As Defendants point out, the medical providers at Wishard Hospital apparently felt Dr. Hermina's treatment plan was effective because they kept in place the same treatments for Mr. Glisson's hypothyroidism, hypertension, malnutrition, chronic pain, and depression that Dr.Hermina had ordered.

Plaintiff also contends that Dr. Hermina exhibited deliberate indifference to Mr. Glisson's serious medical needs by ignoring the fact that Glisson had low oxygen saturation levels on several occasions while incarcerated, which, according to Dr. Sommer, could have signaled pneumonia or another serious physical condition. The undisputed evidence is that Mr. Glisson's oxygen saturation levels were low between September 5 and September 8, 2010,

---

[5] Mr. Glisson was given a head CT while he was hospitalized at Wishard and it showed no evidence of the possible health concerns raised by Dr. Sommer in her expert report, such as trauma, stroke, or metastatic disease.

approximately three weeks before he was transferred to the infirmary and first came under Dr. Hermina's care, and that his levels were moderately below normal on two occasions while in the infirmary, to wit, on September 25 and September 29, 2010. However, Mr. Glisson's oxygen level routinely improved with suctioning of his trach,[6] and, on September 25th, two days before Dr. Hermina first examined him, although Mr. Glisson's oxygen saturation level was moderately low at 90%, his other vital signs were normal, he was cooperative with the assessment, was able to provide care for his tracheostomy and to bring up secretions himself using his suction device, and was alert and able to make his needs known.

The only time that Mr. Glisson's oxygen saturation level was low while he was in Dr. Hermina's care was on September 29, 2010, when it measured 90% at 9:43 a.m. as recorded by Nurse Combs; all other vital signs were normal at that time. Although Dr. Hermina made no special note about the moderately low oxygen saturation level that afternoon when he saw Mr. Glisson, it is undisputed that, by that point, Dr. Hermina had just received Glisson's labwork indicating he was in renal failure and was at that time arranging for emergency attention to that clearly more serious medical need. Other than the occasions described above, Mr. Glisson's oxygen saturation was measured at normal levels while in the infirmary. Significantly, upon Mr. Glisson's return from Wishard Hospital on October 7, 2010, his oxygen saturation levels remained above 90% until his death on October 10, 2010. Accordingly, there were no low oxygen saturation levels for Dr. Hermina to have ignored during the three days between when Mr. Glisson returned from the hospital and his death.

---

[6] Plaintiff points to September 8, 2010 as an example of a time when Mr. Glisson's oxygen saturation level did not improve with suctioning. However, on that occasion, after suctioning did not improve Mr. Glisson's saturation level, a nurse instructed Mr. Glisson to close his eyes and take deep breaths at which point it rose to 97% after initially being measured at 84%.

Plaintiff's expert, Dr. Sommer, suggests that Dr. Hermina's failure to specifically address Mr. Glisson's low oxygen saturation levels exhibited deliberate indifference to the possibility that Glisson was suffering from pneumonia. When Mr. Glisson was transferred to Wishard Hospital, he was diagnosed with pneumonia and given an antibiotic to treat the pneumonia, which Dr. Hermina continued to administer upon his return to the IDOC infirmary, up to the time of his death. However, given that Mr. Glisson's low saturation levels generally improved with suctioning, coupled with the fact that he exhibited normal saturation levels on September 26 and again on September 27, 2010 when Dr. Hermina initially examined him, we cannot find that Dr. Hermina's failure to suspect or diagnose pneumonia before Glisson was admitted to Wishard Hospital was so consciously reckless or such a substantial departure from professional standards that it violated Mr. Glisson's Eighth Amendment rights. While in hindsight, Dr. Hermina may have missed possible signs of pneumonia, there is no indication that he displayed a subjective indifference to a serious medical need at the time he was treating Mr. Glisson as required to run afoul of the Constitution.

Finally, Plaintiff faults Dr. Hermina for failing to adequately communicate with the medical staff at Wishard Hospital when Mr. Glisson was transferred on September 29, 2010. However, there is no evidence that any provider at Wishard felt he or she had insufficient information in the course of treating Mr. Glisson or that his treatment suffered because of a lack of communication. It is undisputed that Mr. Glisson's medical records accompanied him to Wishard Hospital and that he received treatment there for acute renal failure, acute respiratory insufficiency/pneumonia, hypothyroidism, malnutrition, squamous cell carcinoma of the left tongue, chronic pain and dementia, and that he was evaluated for a new voice prosthesis. It is not clear how additional information from Dr. Hermina would have affected the medical care

Mr. Glisson received at Wishard Hospital. Dr. Sommer theorizes that if Dr. Hermina would have communicated with Wishard staff regarding Mr. Glisson's condition, "the feasibility of his return to the facility could have been evaluated" and that he might have been transferred out of prison to a "nursing home setting or sub-acute setting." Sommer Report at 7. However, the extent of Dr. Hermina's authority with regard to transferring Mr. Glisson outside of IDOC was to summon an ambulance and order he be taken to the hospital. Beyond that, it is undisputed that Dr. Hermina did not have the authority to direct or arrange for permanent placement of Mr. Glisson outside of prison. In short, there is no basis for finding that Dr. Hermina was deliberately indifferent to Mr. Glisson's serious medical needs by failing to communicate with Wishard staff.

For the foregoing reasons, Plaintiff has failed to establish that Dr. Hermina was at any point or in any fashion deliberately indifferent to Mr. Glisson's serious medical needs. Accordingly, Plaintiff's § 1983 claim brought against Dr. Hermina cannot survive summary judgment.

### 2. Nurse Combs

Plaintiff contends that Nurse Combs exhibited deliberate indifference to Mr. Glisson's serious medical needs by ignoring the evidence of his rapid deterioration and failing to alert a physician when she saw inappropriate vital signs, as well as in her handling of him on the day of his death, October 10, 2010. We address these arguments in turn.

On September 25 and 29, 2010, Nurse Combs assessed Mr. Glisson during her rounds in the infirmary and, on both occasions, measured his oxygen saturation level at 90%. Plaintiff argues that, while in a normal patient, these moderately low readings may not have been cause for significant concern, considering Mr. Glisson's previous low oxygen saturation readings and

his high risk for pneumonia, oxygen saturation readings of 90% should have caused Nurse Combs to perform further evaluation or alert a physician. However, it is undisputed that, on September 25th, other than the 90% oxygen saturation level, all of Mr. Glisson's vital signs were normal, he was alert and able to communicate his needs, his gait was steady, and he was able to perform his tracheostomy care. Nurse Combs also recorded a 90% oxygen saturation level for Mr. Glisson on September 29, 2010, but again, all of his other vital signs were normal. Given the fact that Mr. Glisson's vital signs were otherwise normal and there were no other warnings of distress, there is no indication on either occasion that Nurse Combs was subjectively aware of an immediate serious medical need of Mr. Glisson's that she deliberately ignored.[7] *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("The deliberate indifference test … has both objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk."). Accordingly, Nurse Combs's failure to consult a physician regarding Mr. Glisson's moderately low oxygen saturation level on September 25 and September 29, 2010 did not run afoul of the Constitution.

Nor can we find that Nurse Combs's actions on October 10, 2010, constitute deliberate indifference. That morning, while performing her 6:00 a.m. morning rounds, Nurse Combs was alerted to the fact that Mr. Glisson was in another patient's bed, engaging in irrational behavior. At that point, she put Mr. Glisson alone in a medical observation cell and placed his suction machine outside of the room for what she believed were safety reasons. Although she told him what she was doing and why, she noted that it was unclear whether he understood her. At 7:48 a.m., Nurse Combs noted that Mr. Glisson was restless in bed in the isolation room.

---

[7] Although Plaintiff faults Nurse Combs for failing to call a physician on September 29th, the undisputed facts establish that Dr. Hermina saw Glisson twice that day – once in the morning before Nurse Combs took his vital signs and then again in the afternoon when he ordered Glisson's transfer to the hospital based solely on lab results that came in after Nurse Combs's examination.

Approximately thirty minutes later, at 8:20 a.m., Nurse Combs was alerted by prison staff that Mr. Glisson did not appear to be moving, at which point she immediately responded, and, when she found him unresponsive, she called 911. EMS responded by 8:30 a.m. and Mr. Glisson was pronounced dead at 8:35 a.m.

Clearly, once Nurse Combs was told that Mr. Glisson was not moving, she acted promptly and undertook reasonable actions to address his obvious need for immediate medical attention. Accordingly, the only issue in dispute is whether her actions leading up to that point comported with constitutional requirements. Plaintiff argues that by placing Mr. Glisson in the isolation room and failing to immediately alert a physician or transfer him to the hospital upon first observing his irrational behavior, Nurse Combs acted with deliberate indifference to his serious medical needs. We disagree. The undisputed evidence in the record leads to no other conclusion than that Nurse Combs made a good-faith effort to address Mr. Glisson's irrational behavior in a manner she believed was calculated to balance concerns regarding his condition with safety concerns, by separating him from the other prisoners in an observation room where he could be monitored. After Mr. Glisson was placed in the medical isolation room, Nurse Combs and prison staff continued to monitor him, as evidenced by Nurse Combs's notes at 7:48 a.m. that he appeared restless in bed and the prison staff's subsequent report approximately thirty minutes later that Mr. Glisson appeared not to be moving. Although more conservative options may have been available upon discovery of Mr. Glisson's odd behavior on the morning of October 10th, the Eighth Amendment does not require that prisoners receive the "best" care available and even negligence, which would constitute medical malpractice, does not violate a prisoner's constitutional right to adequate health care as long as subjective indifference to a serious medical need is not demonstrated. *See King*, 680 F.3d at 1019; *Johnson v. Doughty*, 433

F.3d 1001, 1013 (7th Cir. 2006). There simply is no such evidence in the record here that Nurse Combs's treatment of Mr. Glisson was either consciously reckless or a substantial departure from professional standards such that it violated the Eighth Amendment. Accordingly, Plaintiff's § 1983 claim against Nurse Combs must be dismissed.

### B. Defendant Correctional Medical Services, Inc.

CMS is a private corporation that acts under color of state law by contracting to perform a government function, i.e., providing medical care to correctional facilities. As such, CMS is treated as a government entity for purposes of claims brought pursuant to § 1983. It is well-established that there is no respondeat superior liability under § 1983. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619-20 (7th Cir. 2001). A "private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (citations omitted). Rather, to maintain a viable § 1983 action against a government agent such as CMS, "a plaintiff must demonstrate that a constitutional deprivation occurred as the result of an express policy or custom promulgated by that entity or an individual with policymaking authority." *Gayton*, 593 F.3d at 622 (citing *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)).

Here, Plaintiff maintains that CMS has a policy that "prevents its medical personnel from communicating properly and ensuring appropriate continuity of care for inmates with serious medical problems" which "exhibits deliberate indifference to [inmates'] serious medical needs …." Pl.'s Resp. at 31. However, our conclusion as to the § 1983 claims brought against Dr. Hermina and Nurse Combs dictates that Plaintiff's claim against CMS likewise must fail. Where, as here, a plaintiff has not established that a constitutional injury occurred, a "custom or policy" claim stemming from this notional injury fails as a matter of law. *See Ray v. Wexford*

*Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013) ("It is unnecessary to decide what the [corporate defendant]'s policy may be, since [plaintiff] has not established a constitutional problem with his treatment and thus did not suffer actionable injury from the policy he attributes to the corporation"). Accordingly, Plaintiff's § 1983 claim brought against CMS cannot survive summary judgment.

## III.    State Law Claims

Having determined that all of Plaintiff's federal claims must be dismissed, we turn to the question of whether we should exercise supplemental jurisdiction over the remaining claims in this case, all of which arise under Indiana law. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). Although the presumption is rebuttable, "it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *RWJ Management Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (citation omitted). The Seventh Circuit has identified the following three situations in which a court should retain jurisdiction over supplemental claims even though all federal claims have been dismissed: where the statute of limitations would bar the refiling of the supplemental claims in state court; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; or where it is obvious how the claims should be decided. *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007) (citation omitted).

Upon review of the relevant factors, we find that the presumption in favor of remanding state claims is not overcome here. This case was originally filed in state court and Defendants

removed it on the basis of the complaint's federal claims brought pursuant to § 1983. Remanding the state law claims as opposed to dismissing them with prejudice will address any concerns related to statute of limitations issues. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351-52 (1988) (observing that remand may be preferable to dismissal without prejudice "when the statute of limitations on the plaintiff's state-law claims has expired before the federal court has determined that it should relinquish jurisdiction"). Although this remand comes relatively close to the scheduled trial date, this fact alone is insufficient to overcome the presumption in favor of remand. *See Myers v. Cnty. of Lake Ind.*, 30 F.3d 847, 848 (7th Cir. 1994) ("[D]ismissal of the federal claim on the eve of trial is not by itself sufficient to justify resolving the remaining claims in federal court."). Throughout the past seventeen months that this case has pended on our docket, there have been no substantive rulings made on the state-law claims nor have significant judicial resources been otherwise dedicated specifically to their resolution. Finally, while the state law claims in this case are not unusually complex, their resolution is not sufficiently obvious to justify resolving them in federal court. Accordingly, having now disposed of all federal claims in this litigation, pursuant to pursuant to 28 U.S.C. § 1367(c), we relinquish supplemental jurisdiction over all claims under state law and remand these claims to the Marion Superior Court, where this suit began.

## IV.    Conclusion

For the reasons detailed above, the CMS Defendants' Motion for Summary Judgment is <u>GRANTED IN PART</u> as to the federal claims brought pursuant to 42 U.S.C. § 1983 and all pending motions to limit or exclude expert testimony filed by Defendants [Docket Nos. 51, 52, 79, 83, and 85] are <u>DENIED AS MOOT</u>. Having dismissed all federal claims in this litigation, we relinquish supplemental jurisdiction over all remaining state law claims, which are hereby

REMANDED to Marion Superior Court.  The Clerk of Court is hereby directed to effect this

remand under cause number 49D05-1208-CT-034526 as promptly as possible.

IT IS SO ORDERED.


Date:  _____6/4/2014_____          _Sarah Evans Barker_____

                                                                      SARAH EVANS BARKER, JUDGE
                                                                      United States District Court
                                                                      Southern District of Indiana

Distribution:


J. Richard Moore
BLEEKE DILLON CRANDALL
richard@bleekedilloncrandall.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL PC
jeb@bleekedilloncrandall.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

T. Allon Renfro, Jr.
INDIANA ATTORNEY GENERAL
allon.renfro@atg.in.gov

Samuel Mark Adams
MICHAEL K. SUTHERLIN & ASSOCIATES
msutherlin@gmail.com

Michael K. Sutherlin
MICHAEL K. SUTHERLIN & ASSOCIATES, PC
msutherlin@gmail.com

David A. Arthur
OFFICE OF THE ATTORNEY GENERAL
David.Arthur@atg.in.gov