UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NICHOLAS GLISSON (Estate of) Alma Glisson, Personal Representative of Estate, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:12-cv-01418-SEB-MJD |
| CORRECTIONAL MEDICAL SERVICES, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

**ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY**

Plaintiff sued Defendant under 42 U.S.C. § 1983 for deliberate indifference to the

serious medical needs of Nicholas Glisson, who died while in the custody of the Indiana

Department of Corrections ("the DOC").  Alma Glisson, the personal representative of

Mr. Glisson's estate, brought this lawsuit asserting that the medical care provided by the

DOC's chosen provider, Defendant Correctional Medical Services, Inc. ("Corizon"),

violated his rights under the Eighth Amendment to the United States Constitution, made

applicable to the states by the Fourteenth Amendment.  This matter is set for trial on

January 28, 2019.

Now before the Court are Defendant's Motion to Limit Expert Diane Sommer

[Dkt. 79], Motion to Exclude Expert Stan Smith, Ph.D. [Dkt. 51], and Supplemental

Motion to Exclude Testimony from Plaintiff's Designated Expert Witness Stan Smith,

Ph.D. [Dkt. 83], all filed pursuant to Federal Rule of Evidence 702 and *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  For the reasons detailed

below, we <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendant's motion to limit the testimony of Dr. Sommer and <u>GRANT</u> Defendant's motions to exclude the testimony of Dr. Smith.

**Factual Background**

**I. Diane Sommer, M.D.**

Diane Sommer, M.D., is a medical doctor in practice since 1990. She received her undergraduate degree from Long Island University, her medical degree from SUNY Health Science Center, and completed her residency at Eisenhower Army Medical Center. Dr. Sommer has worked in various medical settings throughout her career, including as a family practice doctor and emergency room physician. Since 2003, she has been employed by the Federal Bureau of Prisons at the Federal Correctional Institute, Otisville as Clinical Director.

In connection with this case, Dr. Sommer reviewed Mr. Glisson's prison medical records, materials related to his Wishard Hospital admission, his personal medical records, and the coroner's report. She reviewed as well the depositions of Dr. Herminia and Nurse Mary Combs and a two-page report prepared at the request of the Hendricks County Coroner by Dr. Stephen Radentz, a forensic pathologist.[1] Dr. Sommer also reviewed various DOC policy directives and guidelines. Based on her review of these materials, Dr. Sommer has concluded that the treatment Mr. Glisson received while

---

[1] Dr. Sommer refers in her expert report to having reviewed "the coroner report and autopsy report." Dkt. 79-1 at 1. There was no autopsy performed on Mr. Glisson, however. The parties appear to agree that the document to which Dr. Sommer intended to refer was Dr. Radentz's two-page report.

incarcerated fell below the standard of care in several ways, that his "medical care reflects a lack of continuity of care and a failure of communication among providers," and that "the health care [Mr. Glisson] received throughout his brief incarceration [led] to his early death." Dkt. 79-1.

## II.     Stan Smith, Ph.D.

Stan Smith, Ph.D. is an economist who received his undergraduate degree from Cornell University and his Master's Degree and Ph.D. in Economics from the University of Chicago. Dr. Smith is expected to testify regarding damages associated with Mr. Glisson's "loss of enjoyment of life," also known as "hedonic damages." Dr. Smith has reviewed the following materials: the Complaint; Corizon's answer to the Complaint; Plaintiff's answers to Defendant's first set of interrogatories; the declaration of Dr. William D. Fisher, D.O.; the presentence investigation report; the judgment and sentence; a June 20, 2013 informational interview with Alma Glisson; and "the case information form."

Dr. Smith opines that Plaintiff is entitled to recover an amount not to exceed $3,371.253.00 as damages for Mr. Glisson's loss of enjoyment of life or hedonic damages. This number is based not on any characteristic particular to Mr. Glisson's life, rather on "the average value of a statistical life and life expectancy of 79.5 years." Dkt. 51-1 at 2.

Dr. Smith's methodology for quantifying the value of Mr. Glisson's enjoyment of life is based on economic research based on a statistical life analysis. Dr. Smith describes this research as consisting of "many economic studies on what we, as a contemporary

society, actually pay to preserve the ability to lead a normal life." *Id.* The value of

statistical life ("VSL") studies on which Dr. Smith relies assign a value to human life

based on data gathered from either: (1) consumer behavior and purchases of safety

devices, like installing smoke or carbon monoxide detectors as a protective measure; (2)

wage risk premiums to workers (*i.e.*, providing extra compensation to workers

performing more dangerous jobs); and/or (3) cost-benefit analyses of governmental and

industrial safety regulations. *Id.* at 3.

To reach his estimate of Mr. Glisson's value of life for purposes of determining

hedonic damages, Dr. Smith first considered selected systemic reviews, or "meta-

analyses," of the VSL research[2] in order to synthesize the data into an average VSL,

which Dr. Smith "estimate[s]" is $4.5 million in year 2013 dollars. Dkt. 51-1 at 3. Dr.

Smith refers to this number as being the "central tendency" of the range of the economic

studies on the value of life. *Id.* It is not clear from his report the exact calculations he

next performed to arrive at the dollar figure of $3,371,253.00 as the value of Mr.

Glisson's enjoyment of life. Although not explained in his report, we accept Defendant's

proffered explanation that the calculations include dividing $4.5 million by the residual

life expectancy of the "statistically average person," and then applying a 1.25% discount

---

[2] A "meta-analysis" in statistics "combines the results of several studies that address a set of related research hypotheses" and "increase[s] the statistical power of studies by analyzing a group of studies and provid[ing] a more powerful and accurate data analysis than would result from analyzing each study alone." Dkt. 51-1 at 9.

rate[3] to determine an average annual value of statistical life in the amount of

$131,199.00. Dkt. 51-2 at 2–5. That number ($131,199.00) was then projected out based

on Mr. Glisson's anticipated actual life expectancy (per the life tables from the National

Institute of Health Statistics) to calculate the figure of $3,371,253.00 as the estimate of

the loss of Mr. Glisson's enjoyment of life. Dr. Smith explains in his report that this

number is then subject to adjustments by the jury if the jurors "find circumstances that

would increase or decrease Mr. Glisson's enjoyment of life compared to an average

person." Dkt. 51-1 at 2.

## Legal Analysis

### I.     Applicable Standard

The admissibility of expert testimony is governed by the analytical framework set

out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*,

509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir.

2009). To be admissible under Federal Rule of Evidence 702 and *Daubert*, an expert's

testimony must be reliable and relevant, and the expert must be qualified to give it. Fed.

R. Civ. P. 702; *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). If the *Daubert*

threshold is cleared, "the accuracy of the actual evidence is to be tested before the jury

with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805

---

[3] The discount rate "is based on the rate of return on 91-day U.S. Treasury Bills published in the *Economic Report of the President* for the real return on T-bills primarily for the last 20 years. Dkt. 51-1 at 1.

(7th Cir. 2012) (quoting with unmarked alterations *Daubert*, 509 U.S. at 596). The proponent of expert testimony bears the burden of showing admissibility by a preponderance of the evidence. *Lewis*, 561 F.3d at 705.

## II.     Diane Sommer, M.D.

Defendant seeks to limit the following testimony from Plaintiff's physician expert, Dr. Sommer: (1) any testimony that the medical treatment Mr. Glisson received while incarcerated within the DOC led to his early death, or otherwise caused or contributed to Mr. Glisson's death; and (2) any opinion that Corizon "has an express policy that, when enforced, causes a constitutional deprivation or a practice that is so widespread that, although not authorized by written or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law, or that a constitutional injury was caused by a person with final policymaking authority." Dkt. 156 at 3. We address each of these requests in turn below.

### A.     Cause of Death

Defendant argues that Dr. Sommer should not be permitted to offer her opinion that the care Mr. Glisson received from Defendant while incarcerated either caused or contributed to his death because her report fails to adequately explain the connection between the substandard care that she opines he received and the cause of his death, to wit, complications from laryngeal cancer. We disagree with this characterization of Dr. Sommer's report.

In her expert report, Dr. Sommer opines that despite multiple opportunities for medical intervention during Mr. Glisson's incarceration, his condition was allowed to

6

deteriorate until his death because of the substandard care provided by Corizon.

According to Dr. Sommer, "[m]ultiple care providers were involved in his care and failed

to recognize the seriousness of his condition," reflecting "a lack of continuity of care and

a failure of communication among providers." Dkt. 79-1 at 1. Specifically, Dr. Sommer

opines that, despite multiple signs and symptoms of dehydration, infection, and

malnourishment, Mr. Glisson's providers failed to recognize these symptoms and

conditions as possible causes of the deterioration of his mental state, instead attributing

his mental decline to a psychiatric cause which led them to treat Mr. Glisson primarily as

a "behavior management problem." *Id.* at 3.

Dr. Sommer also opines that Mr. Glisson's providers did not properly respond to

his physical deterioration, including his declining nutritional status and abnormal lab

results, particularly with regard to renal and thyroid functions. *Id.* at 4–6. In addition,

Mr. Glisson's providers failed to appropriately respond to his consistently low oxygen

saturation level, which can be a sign of pneumonia, a diagnosis Mr. Glisson eventually

received. *Id.* at 4. Dr. Sommer concludes as stated in her report that the health care Mr.

Glisson received throughout his incarceration "[led] to his early death." *Id.* at 8.

Defendant has not challenged under *Daubert* or Rule 702 Dr. Sommer's opinion

that Mr. Glisson received substandard care or that such care either caused or exacerbated

other physical conditions, including dehydration, malnutrition, renal functioning, and

pneumonia. Nor does Defendant challenge the conclusion that Mr. Glisson's death was

caused by complications related to laryngeal cancer with contributory renal disease.

Defendant argues only that Dr. Sommer failed to support her conclusion with any

evidence or facts that Mr. Glisson's medical treatment in prison "led to his early death" or to provide any scientific explanation regarding how the inadequacies she identifies in the care he received led to his death.

It is true that Dr. Sommer does not offer a scientific explanation regarding how dehydration, malnutrition, impaired renal functioning, and/or pneumonia can or do lead to complications related to laryngeal cancer. But it is well-established that "[a]n expert's testimony is not unreliable simply because it is founded on [her] experience rather than on data …." *Metavante Corp. v Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Experts are permitted to "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). Here, Dr. Sommer's qualifications as a physician are not in question. She reviewed the medical records in this case, applied her experience and knowledge to those facts, and offered her opinion that Mr. Glisson received substandard medical care at the hands of Corizon, that the care he received either caused or exacerbated other physical conditions such as dehydration, malnutrition, impaired renal functioning, and pneumonia, and that these conditions hastened his death, which was determined to have resulted from complications to laryngeal cancer. Although she does not specifically state that, in her opinion, dehydration, malnutrition, impaired renal functioning, and/or pneumonia can be considered complications of laryngeal cancer, that inferential step is obvious when her report is read as a whole.

It is not clear what additional explanation Defendant seeks in alleging deficiencies in her report. Dr. Sommer is permitted to draw the conclusion, based on her experience

8

and training in the medical field, that "complications to laryngeal cancer" may include the physical conditions she has opined resulted from substandard care provided by Defendant, including dehydration, malnutrition, impaired renal functioning, and pneumonia. This conclusion does not exceed the scope of admissible expert opinion and is sufficiently reliable evidence for trial. In fact, it is arguably within the competence even of a layperson to say that if an individual is already in a weakened state, as the record is clear Mr. Glisson was, and becomes dehydrated, is malnourished, or contracts pneumonia, that individual is more susceptible to complications related to an underlying medical condition, making death more likely. While Defendant may disagree with this conclusion, it is not within the court's purview in ruling on this motion to determine whether this opinion is correct. Rather, the "soundness and the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact …." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

### B.    Policy and Practice

With regard to testimony relevant to Corizon's purported decision not to require coordination of medical care, Dr. Sommer's expert report is limited to her opinions that Mr. Glisson's "medical care reflects a lack of continuity of care and a failure of communication among providers," (Dkt. 79-1 at 1), and that "[t]here is no indication from the record that there had been ongoing communication between DOC and the providers at Wishard Hospital while Mr. Glisson was hospitalized or thereafter [which] would have helped facilitate continuity of care." *Id.* at 7. Thus, to the extent that Dr.

9

Sommer would testify that Corizon "has an express policy that, when enforced, causes a constitutional deprivation or a practice that is so widespread that, although not authorized by written or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law, or that a constitutional injury was caused by a person with final policymaking authority" that is a decision that the jury will be called upon to make. Dkt. 156 at 3. Because such opinions were not disclosed in Dr. Sommer's expert report and lie outside the scope of her medical expertise, she will not be permitted to testify as such.

Dr. Sommer is not, however, excluded from offering opinions that are within her expertise and disclosed in her report that may be relevant to the jury's consideration of the policy and practice issue. For example, unless subject to some other objection at trial, Dr. Sommer is not prevented from testifying regarding her opinion that the medical care Mr. Glisson received reflected a lack of continuity of care and a failure of communication among providers. Defendant may of course object to specific questions asked of Dr. Sommer at trial if it believes a particular line of questioning will elicit opinions not included in her expert report or which extend beyond the scope of her medical expertise, but there is no basis at this time for limiting her testimony beyond the restrictions described above.

## II.     Stan Smith, Ph.D.

Defendant first seeks to exclude the opinion testimony of Dr. Smith on hedonic damages on the ground that this type of damages should not be recoverable by a decedent's estate in a § 1983 case. We can easily dispense with this argument, however,

10

as "it is well settled in this circuit that 42 U.S.C. § 1983 permits recovery on behalf of the victim's estate for hedonic damages." *Reddick v. Bloomingdale Police Officers*, No. 96 C 1109, 1997 WL 441328, at \*9 (N.D. Ill. July 30, 1997) (citing *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987); *Frye v. Town of Akron*, 759 F. Supp. 1320, 1325–26 (N.D. Ind. 1991)); *see also White v. Gerardot*, No. 1:05-CV-382, 2008 WL 2338307, at \*6 (N.D. Ind. June 4, 2008) (recognizing that the Seventh Circuit "has explicitly found state wrongful death statutes that preclude recovery for the loss of life [like Indiana's] to be inconsistent with the deterrent policies of § 1983"). Thus, Plaintiff may properly claim as an element of damages Mr. Glisson's loss of enjoyment of life and we deny Defendant's motion to exclude on this issue.

However, Defendant's argument that Dr. Smith's testimony on hedonic damages should be excluded because his methodology and results do not comport with the *Daubert* requirements and Rule 702 is persuasive. This conclusion is in line with several district courts within the Seventh Circuit that have excluded Dr. Smith's testimony on similar grounds in other cases. *See Stokes v. John Deere Seeding Group*, No. 4:12-cv-04054-SLD-JAG, 2014 WL 675820, at \*3 (C.D. Ill. Feb. 21, 2014) (collecting cases). We find those rulings apt to our case as well.

To be admissible, expert testimony "must be validated by reliable methods." *Id.* at \*4 (citing *United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013), *cert. denied*, 134 S.Ct. 175 (U.S. 2013)). Here, Dr. Smith fails to adequately explain the manner in which he arrives at his opinion that $4.5 million is the "central tendency" of the meta-analyses of the VSL studies he reviewed. Rather, he simply asserts that upon his consideration of

such meta-analyses, he "estimate[s] the central tendency of the range of the economic studies to be approximately $4.5 million in year 2013 dollars." Dkt. 51-1 at 3. This "unmethodical, subjective 'eyeballing'" method is insufficient to pass muster under *Daubert* or Rule 702. *Stokes*, 2014 WL 675820, at \*4 (citing *Ayers v. Robinson*, 887 F. Supp. 1049, 1060 (N.D. Ill. 1995)). Nor does Dr. Smith explain in any detail the calculations he made or the methodology he used to arrive at his estimate of $3,371,253 as the ultimate value of life for Mr. Glisson, preventing us from assessing the reliability of the methods used.

Moreover, even if Dr. Smith's methods of calculation were reliable, the VSL studies on which his expert opinion depends establish only how the overall value of a life is measured in the field of economics, not how *enjoyment of life* is measured, which is the relevant question the jury must resolve in awarding hedonic damages. *See, e.g.*, *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992) (expressing "serious doubts about [Dr. Smith's] assertion that the studies he relies upon actually measure how much Americans value life")*; Smith v. Jenkins*, 732 F.3d 51, 67 (1st Cir. 2013) ("[T]he [VSL] studies do not relate in any way to the actual component of damages, the enjoyment of life.") (quotation marks and citation omitted) (emphasis removed); *Sullivan v. U.S. Gypsom Co.*, 862 F. Supp. 317, 321 (D. Kan. 1994) ("The studies relied on by Mr. Smith do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data for … loss of enjoyment of life."). Thus, "the VSL research is only connected to any particular value placed on enjoyment of life 'by the *ipse dixit* of the expert.'" *Stokes*, 2014 WL 675820, at \*5

(quoting *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013)). As such, Dr. Smith's hedonic damages testimony "lacks a factual basis" and is therefore inadmissible on these grounds. *Castrillon v. St. Vincent Hosp. and Health Care Ctr.*, No. 1:11-cv-430-WTL-DML, 2015 WL 3448947, at \*2 (S.D. Ind. May 29, 2015); *see also Manpower*, 732 F.3d at 806 ("The critical inquiry [under Rule 702] is whether there is a connection between the data employed and the opinion offered ….").

For these reasons, we hold that Dr. Smith's testimony is both unreliable and unlikely to assist the jury in valuing hedonic damages and is thus excluded from trial.

## III. Conclusion

As detailed above, Defendant's Motion to Limit Expert Diane Sommer [Dkt. 79] is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>. Defendant's Motion to Exclude Expert Stan Smith, Ph.D. [Dkt. 51] and Supplemental Motion to Exclude Testimony from Plaintiff's Designated Expert Stan Smith, Ph.D. [Dkt. 83] are <u>GRANTED</u>. Although Dr. Smith's expert testimony on hedonic damages is excluded, Plaintiff may still claim as an element of damages Mr. Glisson's loss of enjoyment of life.

IT IS SO ORDERED.

Date:  12/27/2018

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:
All electronically registered counsel of record via CM/ECF